**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re: | Case No. 14-_____ |
| **TEC/GULL CREEK, INC.,** | **Chapter 11** |
| Debtor. | |

**DECLARATION OF LLOYD R. KITCHEN JR. IN SUPPORT OF VOLUNTARY**
**PETITION AND FIRST-DAY APPLICATIONS AND MOTIONS**

Lloyd R. Kitchen Jr., under penalty of perjury, hereby declares as follows:

1.      I am the Executive Vice President of TEC/Gull Creek, Inc. ("Gull Creek" or the "Debtor").  In this capacity, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records.

2.      On June 27, 2014 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for bankruptcy relief and protection under chapter 11 of title 11 of the United States Code 11 U.S.C. § 101, et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maryland.  The Debtor is continuing in possession of its property and the management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      I submit this declaration in support of the Debtor's various first day applications and motions (the "First-Day Motions").  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant application or motion.  Except as otherwise indicated, all facts set forth in this declaration are based on my (a) personal knowledge, (b) review of the relevant documents or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, or (c) my understanding and belief

with respect to such matters, including after consultation with the Debtor's professional advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.      Part I of this declaration describes the Debtor's business and the circumstances leading up to the filing of the chapter 11 petition.  Part II sets forth the relevant facts in support of the Debtor's various First-Day Motions.

## PART I

### I.      THE DEBTOR AND ITS BUSINESS OPERATIONS

5.      The Debtor is a non-profit Maryland corporation which operates the Gull Creek Retirement Community in Berlin, Maryland (the "Facility").  The Facility is a free-standing residential retirement community that provides both independent living services and assisted living services to its residents.  The predecessor to the Debtor obtained, renovated, and expanded the Facility in 1996 through a bond financing described below.  The predecessor company was AHF/Gull Creek, Inc. ("AHF"), a subsidiary of American Health Foundation, Inc.  The Debtor took over ownership and operational control of the Facility in April 2001.

6.      The Debtor is a subsidiary of The Emmaus Calling, Inc. ("TEC"), which is a non-stock, non-profit organization under section 501(c)(3) of the Internal Revenue Code.  Because it operates as a subsidiary of TEC, the Debtor is also a non-stock, non-profit organization under section 501(c)(3) under a group exemption from the Internal Revenue Service.  TEC oversees a family of operations similar to the Debtor's which are also part of the group exemption.  TEC provides strategic administrative and managerial support to the Debtor, including the completion of all state and federal filings in connection with the Debtor's non-profit status.

7.      The Facility has been managed by Complete Healthcare Resources – Eastern, Inc. ("CHRE") since 2001 pursuant to an agreement between the Debtor and CHRE.  CHRE provides

day-to-day operational and management support, and also employs a full-time administrator on-site at the Facility.  The Facility otherwise has approximately 60 employees who are employed directly by the Debtor.   As of the Petition Date, the Debtor's total debt obligations are approximately $15,700,000.00 ("Total Debt Obligations").   Of the Total Debt Obligations, approximately $14,506,677.81 is owed to the Indenture Trustee (defined below) and Bondholders (defined below), $1,130,607.00 is owed to the Facility's former manager Iatros Health Network, Inc. on account of accrued and unpaid management fees of $430,607.00 and a note payable of $700,000.00, and $52,343.79 is owed to American Health Foundation, Inc. on account of a loan, all which has been on the Debtor's books since 2001.  Other than the Debtor's obligations to the Indenture Trustee, Bondholders, and those referenced above, the Debtor is generally current with all other creditors.

8.    The Facility currently maintains thirty-eight (38) independent living units and thirty-eight (38) assisted living units.  There are presently ten (10) units allocated for the memory support service, for a total of eighty-six (86) units.

## II.    THE DEBTOR'S PREPETITION OBLIGATIONS AND DEBT STRUCTURE

9.    On May 15, 1996, the Maryland Economic Development Corporation ("MEDCO") issued $7,930,000 Retirement Facility Mortgage Revenue Bonds (AHF/Gull Creek, Inc. Facility), Series 1996 (the "Bonds") for the purposes of, among other things, financing the acquisition and renovation of the Facility.

10.    The Bonds were issued pursuant to that certain Trust Indenture (the "Original Indenture") dated as of April 1, 1996 between MEDCO and The First National Bank of Maryland, predecessor in interest to Manufacturers and Traders Trust Company. The Original Indenture was amended and supplemented by a First Amendment to Trust Indenture dated as of

3

April 1, 2001 (the "Indenture Amendment"; the Original Indenture and the Indenture Amendment are collectively referred to herein as the "Trust Indenture").  Manufacturers and Traders Trust Company, successor-in-interest to Allfirst Bank, formerly known as The First National Bank of Maryland (the "Indenture Trustee") serves as trustee for the registered owners of the Bonds.

11.     As is typical of bond issuances, the Bonds were sold on the market through brokerages and clearinghouses.  Cede & Co., as nominee of The Depository Trust Company ("DTC"), holds the Global Note and is the sole registered owner of the Bonds.   Various brokerage and clearinghouses are holders of the Bonds and act on behalf of indirect participants, who in turn act on behalf of beneficial owners of the Bonds pursuant to the Trust Indenture.   The brokerage and clearinghouses maintain records of the identities and contact information of the indirect participants and beneficial bondholders (the "Bondholders").

12.     The Debtor's obligations in connection with the Bonds are evidenced pursuant to that certain Loan Agreement dated as of April 1, 1996 (the "Original Loan Agreement") between the Debtor and MEDCO, as amended and supplemented by that certain First Amendment to Loan Agreement dated as of April 1, 2001 (the "Loan Agreement Amendment"; the Original Loan Agreement and the Loan Agreement Amendment are collectively referred to herein as the "Loan Agreement").

13.     As a consequence of the nature of the Bond trade and the structure of the Trust Indenture, there are many Bondholders who are potential creditors with potential claims against the Debtor's estate.

14.     The Debtor's obligations under the Loan Agreement and all other documents executed by the Debtor in connection with the Bonds are secured pursuant to that certain Deed of

Trust (the "Deed of Trust") dated as of April 1, 1996 from the Debtor to Jay Smith and David L. Williams, Individual Trustees, for real estate located at One Meadow Street in Berlin, Maryland (the "Real Property"), for the benefit of MEDCO and its assigns, including the Indenture Trustee, and recorded among the land records of Worcester County, Maryland in Liber 2273, folio 029.

15.     Pursuant to the Deed of Trust, the Debtor granted the Indenture Trustee a first priority lien on and security interest in the Real Property and related personal property including, but not limited to, all furniture, fixtures, leases, deposits, rents, income and other property interests more fully described therein (collectively with the Real Property, the "Property").

16.     The Debtor's obligations are further secured pursuant to that certain General Assignment of Leases and Rents (the "Assignment of Leases and Rents") dated as of April 1, 1996 from the Debtor to the Indenture Trustee.

17.     The Indenture Trustee's security interest in the Property is further evidenced and perfected pursuant to those financing statements filed with the Maryland State Department of Assessments and Taxation as File Nos. 161368588, 161368589, 181417330, and 181417331 (collectively, the "Financing Statements"). The Trust Indenture, the Loan Agreement, the Deed of Trust, the Assignment of Leases and Rents, the Financing Statements and each of the other documents evidencing, securing or relating to the Bonds, as amended, supplemented or modified from time to time, are sometimes collectively referred to herein as the "Bond Documents".

III.    **EVENTS LEADING TO THE DEBTOR'S BANKRUPTCY FILING**

18.     The Debtor has been in default under the Bond Documents since it took control of the Facility in 2001 due to certain operational and capital costs and competitive market

pressures.  The Bonds originally went into default in 1998 when the Facility initially experienced financial distress under AHF, the Debtor's predecessor.

19.    Beginning in April 2001, the Debtor and the Indenture Trustee have entered into a series of four (4) forbearance agreements in connection with the Bond Documents.  Each of the forbearance periods was approved by a majority of the Bondholders and lasted for a period of two (2) years.

20.    The forbearance periods have allowed the Debtor to improve its finances and develop its ability to attract and retain residents.  During the three (3) most recent forbearance periods, the Debtor paid partial interest payments on the Bonds.

21.    Following the expiration of the most recent forbearance period in February 2011, the Debtor, through negotiations with the Indenture Trustee, sought an extension of the forbearance period in order to allow it to address upcoming operations and capital expenses while also servicing its obligations on the Bonds to the best of its ability.  The Bondholders did not approve the fifth forbearance period, and the Debtor thereafter negotiated other possible resolutions with the Indenture Trustee.

22.    On January 29, 2014, the Indenture Trustee sent a default and acceleration notice to the Debtor in which it stated that the full amount of the principal, interest, and other fees, costs, and expenses totaling $14,367,328.41 were immediately due and payable.  On February 5, 2014, the Indenture Trustee filed a Verified Petition for Appointment of a Receiver (the "Receiver Petition") in the Circuit Court for Worcester County, requesting that the court appoint a receiver for the Debtor.

23.    Subsequent to the filing of the Receiver Petition, the Indenture Trustee and Debtor negotiated the terms of a consent order (the "Consent Order") that was filed in the

receivership proceeding, which, among other things, provided for (a) the extension of the deadline for the Debtor to file a response to the Receiver Petition to June 23, 2014, which was subsequently amended to extend the Debtor's response deadline to June 30, 2014; (b) the Debtor to operate under the terms of a budget agreed to by the Indenture Trustee; (c) the Debtor providing weekly reporting to the Indenture Trustee; (d) the Debtor making certain Adequate Protection Payments and Indenture Trustee Fee Reserve payments (as those terms are defined in the Consent Order) to the Indenture Trustee; (e) the Debtor engaging an investment banker acceptable to the Indenture Trustee to diligently market the Property for sale; (f) the Debtor selecting a stalking horse bidder and negotiating and executing an asset purchase agreement (the "Sale Agreement") for the sale of the Property; (g) the Debtor maintaining insurance and licenses and paying on a current basis all taxes; (h) the Debtor ensuring that TEC continues to include the Debtor as a subsidiary organization in the group exemption roster covered by the non-profit group determination letter issued by the Internal Revenue Service to TEC, maintaining its status as a section 501(c)(3) organization and otherwise complying with all requirements of the Bond Documents; (i) the reduction of TEC's management and home office fees from a monthly amount of $8,000 to $6,000 which shall be deemed earned and accrued but payment deferred until the time of closing on a sale of the Property; (j) the Debtor filing a chapter 11 bankruptcy for the purpose of consummating the Sale Agreement; (k) a Carve-Out of $187,500.00 for the reasonable and allowed fees and expenses of attorneys, financial advisors and other professionals employed by the Debtor after the filing of the bankruptcy case other than the fees and expenses incurred by the Debtor's investment banker; (l) the Debtor's release of any claim under Chapter 5 of the Bankruptcy Code for the avoidance of Adequate Protection Payments and Indenture Trustee Fee Reserve payments the Debtor made to the Indenture Trustee prior to the Petition

7

Date and which shall be provided for in any cash collateral agreement entered into between the Debtor and Indenture Trustee; (m) the Debtor and Indenture Trustee's agreement that the fees and expenses incurred by the Debtor's professionals prior to the bankruptcy filing may be paid from retainers previously provided to them by the Debtor; and (n) the Debtor and Indenture Trustee's agreement to negotiate in good faith to agree to terms of a cash collateral order prior to the filing of the bankruptcy case.

## PART II

24.    Given the size, nature and complexity of the Debtor's business operations, the Debtor requires a variety of "first day" relief from the Court.  Therefore, concurrently with the filing of its chapter 11 voluntary petition, the Debtor filed a number of First-Day Motions.

25.    An important and critical element of the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the First-Day Motions.  Generally the First-Day Motions are designed to facilitate: (a) the continuation of the Debtor's existing cash management systems and other business operations without interruption, (b) the discovery of the Debtor's indirect participants and beneficial bondholders, (c) maintenance of employee morale and confidence through the continuation of the Debtor's ordinary-course wage and benefits payments, (d) the continuation of the Debtor's utility service and the establishment of adequate protection for its utility providers; (e) the Debtor's use of cash collateral pursuant to adequate protection standards; (f) the determination that the Debtor's present patient care and service obviates the need for a patient care ombudsman; and (g) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.  The factual background in support of each First-Day Motion is provided below:

### A. Emergency Motion for Interim and Final Orders Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service and Deeming Utility Companies Adequately Assured of Future Performance

26.     The Debtor seeks the entry of an order, (i) approving the Debtor's proposed adequate assurance of payment to be made for the benefit of the Debtor's utility service providers (the "Utility Companies"), (ii) determining that the Utility Companies have been provided adequate assurance of payment, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to the Debtor; and (iv) establishing procedures for determining requests for any additional adequate assurance demands made by a Utility Company upon the Debtor.

27.     In connection with the operation of its businesses in the ordinary course, the Debtor obtains utility services from a number of Utility Companies, and incurs expenses for such services.  Uninterrupted utility services are critical to the Debtor's ongoing ability to maintain its business, and therefore, to the success of this chapter 11 case.

28.     Generally, the Debtor has established a good and consistent payment history with the Utility Companies making regular, timely payments for expenses incurred.  As of the Petition Date, the Debtor is current with its Utility Companies.

29.     The Debtor proposes to deposit a sum equal to approximately fifty percent (50%) of its average aggregate monthly payment of Utility Companies, or $7,025, into an interest bearing segregated account maintained by the Debtor to provide adequate assurance of future performance to the Utility Companies.

### B. Emergency Motion for an Order Authorizing Payment of Certain Prepetition Compensation and Benefits Owed to Employees and Related Administrative Expenses

30.     As of the Petition Date, the Debtor has approximately 60 employees (the "Employees").   To minimize the personal hardships Employees will suffer if prepetition

employee-related obligations are not paid, and to maintain Employees' morale at this critical time, the Debtor seeks the authority to pay to the Employee certain obligations (the "Employee Obligations") consisting of wages and benefits payments, as well as reimbursement of certain customary reimbursable expenses.

## **Wages and Salaries**

31.     In the ordinary course of business, the Debtor incurs payroll obligations to employees for the performance of services.

32.     The Debtor utilizes the services of an entity known as Intuit Payroll ("Intuit") to outsource the company's payroll processing.  In the ordinary course of business, the Debtor provides the funds necessary to meet its payroll obligations two business days in advance of the pay date.  The Debtor's next scheduled payroll date is July 11, 2014, and such payroll will be for the period ending on July 5, 2014.  As a result of adhering to this payroll process, the Debtor will be required to fund a payroll with prepetition obligations owed to Employees on July 11, 2014.

33.      The Debtor estimates that approximately $45,000 in unpaid salary, wages and other compensation, all earned in the ordinary course of business, is owing to its Employees as of the next pay date, only approximately $16,000 of which was incurred prepetition.

## **Employee Benefits**

34.     In the ordinary course of business, the Debtor maintains an Employee Benefits Program.

35.     The Debtor provides its Employees with medical, prescription and dental insurance through third-party providers.  The Debtor offers medical insurance to certain of the Employees through a plan provided by Coventry Healthcare of Delaware.  A portion of the premiums are paid by the Employees and the Debtor pays the first $1,000 of each insured's deductible.  The Debtor provides dental insurance those Employees that receive medical

insurance through a plan provided by United Healthcare.  A portion of the premiums are paid by the Employees.  The Debtor also provides a certain employee with Medicare supplement medical and prescription coverage through CareFirst BlueCross BlueShield and AARP, respectively, at a lower cost to the Debtor than if this employee participated in the Debtor's regular medical insurance plan.  The Debtor provides basic life insurance to regular full-time Employees through The Hartford.  Finally, the Debtor maintains a workers' compensation insurance plan.  The total amount due monthly under the Employee Benefits Program is approximately $8,200.

36.    Some employees have accrued paid time off as of the Petition Date. The outstanding amount of unused paid time off accrued in the ordinary course of the Debtor's business, if it were payable in cash, is approximately $53,000 as of the Petition Date.

**Reimbursable Business Expenses**

37.    The Debtor reimburses Employees for certain business expenses incurred in the scope of employment, including, without limitation, expenses for business travel, such as for mileage, lodging and parking (collectively, the "Reimbursable Expenses").   All of the Reimbursable Expenses were incurred on the Debtor's behalf in connection with employment by the Debtor in the ordinary course of business of the Debtor, and were incurred in reliance upon the understanding that such Reimbursable Expenses would be reimbursed by the Debtor.

38.    The Debtor estimates that the outstanding amount of Reimbursable Expenses incurred in the ordinary course of the Debtor's business is approximately $1,000.00 as of the Petition Date.

**Payroll Taxes And Other Withholdings**

39.    The Debtor deducts other miscellaneous amounts from its Employees' paychecks (collectively, the "Employee Deductions") and is also required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and

11

Medicare taxes, garnishments, child support payments, etc. (together with the Employee Deductions, the "Payroll Taxes") and remit the same to the appropriate taxing authorities.

40.     The Payroll Taxes, including both the Employee and employer portions, for a typical payroll, total approximately $13,000.

### Administrative Service Provider Costs

41.     The Debtor utilizes certain third-party providers to administer employee benefit plans and payroll services (the "Administrative Service Providers").  The continued support of the Administrative Service Providers is crucial to the Debtor's ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtor's employee benefit and payroll obligations.  The Debtor estimates that the average monthly cost of these services is approximately $320.00.

42.     I believe that, to avoid the risk of such employee resignations and to maintain employee morale, it is critical that the Debtor be authorized to pay each of the Employees all compensation amounts, subject to the statutory caps provided in §§ 507(a)(4)(A) and (a)(5)(B) of the Bankruptcy Code,  that have been earned under the Debtor's prepetition contractual obligations or practices.  It is also essential that the Debtor continue the employee plans and policies in the ordinary course of business and on an uninterrupted basis, as well as continue to pay all tax withholdings over to the taxing authorities and its administrative service providers.

C.      **Emergency Motion for an Order (I) Authorizing Debtor to Continue Use of Its Cash Management System, Existing Bank Accounts and Business Forms, and (II) Waiving the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code**

43.     In the ordinary course of business, the Debtor maintains three (3) bank accounts (the "Bank Accounts") at Bank of America, N.A. (the "Bank") that operate as a central part of its cash management system (the "Cash Management System").  The Bank Accounts consist of a

general operating account (the "Operating Account"), a payroll account (the "Payroll Account"), and an account used for payment of employee health insurance deductibles (the "Health Insurance Account").  Through the Bank Accounts, the Debtor efficiently collects, transfers, and disburses funds for the daily and long-term operations of the Facility.  The Debtor routinely deposits, withdraws, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check and wire transfer.

44.    All deposits made by the Debtor are made into the Operating Account.  The Operating Account is used to fund the Debtor's day-to-day operations as well as its long-term obligations, including the Bonds.  The Debtor also pays all real estate property taxes and personal property taxes from the Operating Account.  The Debtor currently maintains checks and deposit slips for its Operating Account as well as certain automatic withdrawals.

45.    In the ordinary course of business, the Debtor provides the funds necessary to meet its payroll obligations two business days in advance of the pay date through an automatic withdraw from the Operating Account into the Payroll Account.  The Debtor utilizes the payroll-processing services of Intuit Payroll ("Intuit") to issue payroll checks to the Debtor's employees from the Payroll Account.  The Debtor may also transfer additional funds to cover payroll as required.

46.    The Debtor also transfers funds from the Operating Account to the Health Insurance Account on a monthly basis or as needed to cover certain health insurance benefits.

47.    In the ordinary course of business, the Debtor uses numerous varieties of business forms.  Among others, the Debtor currently uses checks and deposit slips for its present Operating Account, letterhead and envelopes, resident agreements, invoices, state licensing

forms, business cards, marketing materials, and other operational forms (collectively, the "Business Forms").

48.    In order to minimize disruption to the Debtor's operations during the pendency of this case, the Debtor is requesting Court permission to continue using the Bank Accounts, rather than opening new debtor-in-possession accounts., and  the Cash Management System, except to the extent it might be modified by the Court's entry of any orders approving the Debtor's use of cash collateral.  Further, the Debtor is requesting an order waiving the Debtor's compliance with the deposit and investment requirements under section 345 of the Bankruptcy Code.

49.    In addition, the Debtor is requesting that, as a way of minimizing expenses to its estate, it be authorized to continue using its Business Forms substantially in the form existing immediately before the Petition Date, without reference to its status as a debtor-in-possession.  In the event that the Debtor needs to purchase new Business Forms during the pendency of its chapter 11 case, the Debtor intends to obtain forms with a legend referring to the Debtor's status as debtor-in-possession.

D.    **Emergency Motion for an Order that the Appointment of a Patient Care Ombudsman Is Not Necessary in this Case**

50.    The Debtor seeks entry of an order determining that a patient care ombudsman is unnecessary in this case.  For the reasons stated herein, I believe that the Debtor's patients do not require the appointment of such an ombudsman as their interests are fully safeguarded through the Debtor's ordinary operations.

51.    The Debtor has only sought bankruptcy relief and protection to consummate to consummate the sale of the Facility through a confirmed chapter 11 plan.  The Debtor has not reduced its staff and continues to maintain its high level of patient care.  Thus, the Debtor's resources are more than adequate to ensure the high quality of patient care remains the same.

14

52.     The additional administrative costs of an ombudsman will drain the Debtor's limited cash resources, causing a heavy burden on the Debtor.  Moreover, while the purpose of the ombudsman is to protect the quality of patient care, here, the Debtor's ability to continue to provide excellent patient care will be jeopardized by the diversion of resources needed to provide that very care to an unneeded source of additional oversight.  If a patient care ombudsman were appointed, the costs associated with such appointment, including potential additional professionals to ensure compliance with the privacy requirements of HIPAA, would be substantial.  Given the level of the Debtor's internal controls, oversight by state agencies, and the current management of the Debtor, the services of a patient care ombudsman would be redundant at this point in time.

53.     Since its founding, the Debtor has provided quality patient care under the supervision of the Office of Health Care Quality of the Maryland Department of Health and Mental Hygiene.  The Office of Health Care Quality is satisfied with the Debtor's past history of providing a high level of patient treatment and there is no reason to believe that the Debtor's bankruptcy will disrupt its otherwise commendable performance.  Additionally, the Facility is has been managed by CHRE since 2001 pursuant to an agreement between the Debtor and CHRE.  CHRE already provides day-to-day operational and management support, and also employs a full-time administrator on-site at the Facility.  The Debtor is meeting and/or exceeding required Maryland state staffing ratios. The Debtor is working to ensure that patient care is provided in an appropriate and planned manner consistent with patients' rights and needs.  However, if the Debtor is required to divert its scarce resources to the payment of an ombudsman, its ability to pay its staff and to retain its staff may be compromised.  As a result, rather than ensuring that patient care is maintained at its current excellent levels, the additional

burden and administrative cost of an ombudsman may produce the very opposite result intended – a decline in the quality of patient care

54.     The majority of the residents are independent and competent individuals.  They are either fully independent or in need of assistance due to physical or medical disabilities rather than due to conditions that impair their intellect.  There are a minority of patients who suffer from Alzheimer's and are dependent to varying degrees.  The vast majority of these residents and patients at the Facility are either fully independent or, even if in need of physical assistance, competent to protect their rights.  Additionally, the rights of those patients who are not competent are protected by the Debtor's high quality of care, the supervision of the Office of Health Care Quality, and the interaction of the Debtor's management and staff with such patients' families.

55.     There is little likelihood of tension between the interests of patients and the Debtor.  The Debtor is continuing to provide the same level of patient care and services to its patients as it did pre-petition.  Additionally, the Debtor's bankruptcy case will not affect the level of care and services as the Debtor is selling the Facility as a going concern to a purchaser that will be subject to the same Maryland state regulations and oversight, and the ongoing operations of the Facility will be a mere continuation of current care and services, without any interruptions in care.

56.     The Debtor has in place various internal safeguards, which weighs against appointing an ombudsman in the Debtor's cases.  The Debtor's management actively monitors all aspects of the Debtor's operations at the Facility and ensures that the staff maintains the highest level of patient care.  The staff is provided with relevant continuing education classes to ensure high quality of resident care.  Gull Creek also receives consultants from its management

16

group which provide guidance and oversight on many aspects of the Debtor's internal safeguards.  Of particular note is the fact that the community has a Medical Director available to provide necessary and support when needed as well as several registered and licensed practical nurses. This complements the residents' own physicians and medical professionals.  Finally, the design of the facilities, implementation of best safety practices (including, for example, door alarms, security monitoring, emergency call bells, and safety equipment), and the Debtor's monitoring, supervision, and emergency procedures and protocols are also intended to aid in the residents' safety, especially with regard to the secure unit for residents with Alzheimer's or Dementia.  Accordingly, this factor weighs against appointing an ombudsman.

57.    The State of Maryland provides extensive monitoring and oversight of the Debtor's operations, patient care and services.  The Assisted Living Division of the Maryland Department of Health and Mental Hygiene Office of Health Care Quality has general oversight and conducts inspections of the Facility's programs and licensing.  In addition, there are a number of other supervisory entities that already monitor the Debtor:  (1) the Worcester County Health Department issues a license and annually inspects the Debtor's kitchen area; (2) the Worcester County Fire Marshall's Office annually inspects the premises and conducts quarterly inspections of the fire protection systems; (3) the State of Maryland issues a license for the Debtor's boiler system dependent on an annual boiler inspection by a third party contractor; and (4) the State of Maryland issues a license for the Debtor's drug administration program and procedures dependent on an annual and unannounced inspection.  Therefore, because the Debtor is already heavily regulated and monitored, an ombudsman's services would be redundant.

58.     Consequently, in lieu of an appointed ombudsman, the Debtor is prepared to self-report and file patient care reports with the bankruptcy court, with copies to the relevant state agencies, every sixty days.

      **E.**     **Emergency Motion for Interim and Final Orders Authorizing the Debtor's Use of Cash Collateral and Granting Adequate Protection to the Debtor's Secured Lenders**

59.     The Debtor requires cash-on-hand and cash flow from its operations to satisfy routine payables and operate the Gull Creek Retirement Community, as well as its bankruptcy case.  All of the Debtor's cash and proceeds thereof are subject to asserted security interests in favor of the Indenture Trustee for the registered owners of the Bonds.  Because the Debtor has no funds other than cash collateral, it has no ability to operate its business without the use of cash Collateral.

60.     The Debtor has an emergency need for the immediate use of cash collateral to, among other things, maintain ongoing day-to-day operations and fund its working capital and liquidity needs.  Absent the use of cash collateral, the Debtor will be forced to cease operations, thereby jeopardizing its ability to operate, harming the Debtor's residents, leaving the Facility in a state of disarray, and significantly lowering recovery for the Debtor's creditors.

61.     If the Debtor's business is ceased, then immediate and irreparable harm will be caused to the Debtor and its residents because the Facility's assisted living license would likely be suspended or revoked by the Maryland Department of Health and Mental Hygiene.  Residents will not be able to obtain the necessary care and assistance that they require, and they will be forced to move, thereby significantly risking their lives and health.

62.     By securing the use of cash collateral, the Debtor will maintain the Debtor's operations throughout its bankruptcy case and continue serving its resident clients.

63.     The Debtor has proposed adequate protection for the benefit of the Indenture Trustee for the registered owners of the Bonds, and believes that the adequate protection proposed is fair and reasonable, and sufficient to protect any diminution in the value of the prepetition Bondholders' interests. The Indenture Trustee consents to the Debtor's use of cash collateral on the terms and conditions set forth in the Debtor's Motion for Orders Authorizing the Use of Cash Collateral.

64.     In sum, absent the immediate use of cash collateral, the Debtor, the estate and its creditors will suffer immediate and irreparable harm.  In contrast, the Indenture Trustee and Bondholders are adequately protected and the Indenture Trustee agrees that the proposed adequate protection is sufficient, and, as a result, will not be prejudiced by the Debtor's use of cash collateral.

**F.     Emergency Motion for Limited Examination of Brokers and Clearinghouses Pursuant to Bankruptcy Rule 2004**

65.     The Debtor filed this chapter 11 case for the purpose of consummating the sale of its assets through a confirmed chapter 11 plan.  The Bonds, which collectively represent the Debtor's largest creditor and which financed the Debtor's acquisition and renovation of the Facility, were sold on the market through brokerages and clearinghouses as is typical of bond issuances.

66.     As noted above, various brokerage and clearinghouses are holders of the Bonds and act on behalf of indirect participants, who in turn act on behalf of beneficial owners of the Bonds pursuant to the Trust Indenture.   The brokerage and clearinghouses maintain records of the identities and contact information of the indirect participants and Bondholders  Consequently there are many Bondholders who are potential creditors with potential claims against the Debtor's estate.

19

67.     Prior to the filing of the Debtor's bankruptcy case, through counsel for the Indenture Trustee, the Debtor was able to obtain contact information for DTC and for certain of the brokerage and clearinghouses and certain Bondholders.  The Debtor has not been able to obtain the identities and contact information for the indirect participants and other Bondholders.

68.     The Examinees (defined below) are required to serve the Debtor's chapter 11 Plan, Disclosure Statement, voting ballot and other documents on the Bondholders that each Examinee holds Bonds for, after receiving service of such documents from the Debtor. However, in addition to serving the Examinees with such documents that the Examinees must in turn serve upon Bondholders in order to provide adequate notice to all creditors, by this Motion the Debtors seek authority under Rule 2004 to request from the Examinees the identities and addresses of all Bondholders, and the principal amount and units of Bonds held by each Bondholder.

69.     The Debtor contemplates that the 2004 examinations of the known brokerages and clearinghouses (the "Examinees") would likely be limited to the production and review of documents that would evidence or relate in any way to the identities and addresses of the Bondholders and the principal amount and units of Bonds held by each Bondholder for the purposes of providing adequate notice to all potential creditors of the Debtor's estate.  At this time, the Debtor does not contemplate any discovery under Rule 2004 of the Examinees other than the limited subpoena of documents requesting the information regarding the Bondholders' identities and notice addresses and the principal amount and units of Bonds held by each Bondholder.

G.     <u>Emergency Motion for an Order to Establish Procedures for Resident Confidentiality in Court Filings</u>

70.     The Debtor desires to protect the privacy of its residents to the fullest extent possible. Making the decision to live in a retirement community such as the Debtor's Facility, which maintains units not just for independent living, but also for assisted living and units for memory support service, is an intensely personal decision, and the Debtor believes its residents' privacy should not be invaded because the Debtor elected to file bankruptcy in order to consummate the sale of the Facility through a confirmed chapter 11 plan.

71.     Additionally, in some cases (especially in its assisted living units and units for memory support service) the Debtor provides various forms of health care services. As a result of the provision of such health care services, the Debtor may be subject to various provisions of the Health Insurance Portability and Accountability Act of 1996 ("<u>HIPAA</u>"). In particular, the Debtor, subject to certain exceptions, may not be permitted to disclose the "protected health information" of residents. "Protected health information" under HIPAA includes, but is not limited to, the names and addresses of residents as well as information related to the past, present or future payment for the provision of health care to a resident. See generally 45 C.F.R. § 160.103. In addition, the Debtor believes it may also be subject to various other federal and state laws that require the confidential treatment of the personal and medical records of residents (together, all such "protected health information" or other information concerning residents entitled to confidential treatment under federal or state law, "<u>Protected Resident Information</u>"). The Debtor has an obligation to make sure its residents' information remains confidential. In order to preserve the confidentiality of Protected Resident Information, the Debtor requests that the Court authorize the implementation of the following procedures (the "<u>Confidentiality Procedures</u>"):

- any schedules of assets and liabilities that may contain Protected Resident Information, including, without limitation, Schedule "F", will be filed under seal with the Court;

- any "creditor matrix" required to be filed will be filed publicly with the names and addresses of residents redacted while a full, unredacted copy will be filed under seal with the Court;

- for any necessary service to residents, the Debtor will file a master list of the names and known addresses for all current residents (the "Current Resident List") under seal and for any pleadings sent to residents, all service will be handled exclusively by Debtor's counsel and the relevant certificate of service will state that the relevant pleading was served "Upon all parties listed on the Current Resident List"; and

- all other pleadings containing Protected Resident Information will be filed publicly with Protected Resident Information redacted while a full, unredacted copy will be filed under seal with the Court.

### H.    Emergency Motion to Extend Time to File Schedules and Statements

72.    I am advised that a schedule of assets and liabilities and a statement of financial affairs (the "Schedules and Statements") are required to be filed with the bankruptcy petition or 14 days thereafter.

73.    The Debtor expects that it will not be able to file the Schedules and Statements within 14 days of the Petition Date.  The complexity of the Debtor's business operations and financial affairs has required the debtor, at the outset of this bankruptcy case, to address a wide-range of critical matters including employee wages and benefits, adequate assurance to utilities and the use of cash collateral.

74.    The Debtor anticipates that a 14 day extension of the deadline, or until July 25, 2014, for filing its Schedules and Statements will enable the Debtor to complete its review of all documents and affairs necessary to such filing.

## I.      **Application for Authority to Employ McGuireWoods LLP as Counsel to the Debtor and Debtor in Possession**

75.     The Debtor seeks to retain McGuireWoods as its counsel because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

76.     The professional services that McGuireWoods will render to the Debtor include, but shall not be limited to, the following:

a.   advising the Debtor of its rights, powers and duties as a debtor and debtor-in-possession;

b.   advising the Debtor concerning, and assisting in the negotiation and documentation of a Chapter 11 plan and related transactions;

c.   reviewing the nature and validity of liens asserted against the property of the Debtor and advising the Debtor concerning the enforceability of such liens;

d.   preparing on behalf of the Debtor all necessary and appropriate applications, motions, pleadings, draft orders, notices, schedules, and other documents, and reviewing all financial and other reports to be filed in this Chapter 11 case;

e.   advising the Debtor concerning, and preparing responses to, applications, motions, pleadings, notices and other papers that may be filed and served in this Chapter 11 case; and

f.   performing all other legal services for and on behalf of the Debtor that may be necessary or appropriate in the administration of this Chapter 11 case.

g.   Subject to Court approval, compensation will be payable to McGuireWoods on an hourly basis, plus reimbursement of actual, necessary expenses incurred by the law firm.

h.   I have been advised that McGuireWoods has not represented any creditors or any other parties-in-interest in any matters relating to the Debtor or its estate.

i.   To the best of the Debtor's knowledge, based upon and as set forth in the Van Horn Affidavit, McGuireWoods does not hold or represent any interest adverse to the Debtor. McGuireWoods' employment is necessary and in the best interests of the Debtor and its estate.

**J.    Application for Authority to Employ and Retain WeinsweigAdvisors LLC as Financial Advisor to the Debtor and Debtor-in-Possession**

77.   The Debtor is familiar with the professional standing and reputation of WeinsweigAdvisors. The Debtor understands that WeinsweigAdvisors has a wealth of experience in providing services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

78.   Prior to the Petition Date, the Debtor engaged WeinsweigAdvisors to provide business and financial advice to the Debtor. As a result, WeinsweigAdvisors has developed a great deal of institutional knowledge regarding the Debtor's operations, finances and systems. This experience and knowledge will be valuable to the Debtor's ability to maximize value for its creditors. Further, WeinsweigAdvisors is well qualified and able to represent the Debtor in a cost-effective, efficient and timely manner. Accordingly, the Debtor wishes to retain WeinsweigAdvisors to provide assistance during this case.

79.   WeinsweigAdvisors has informed the Debtor that it (i) has no connection with the Debtor's creditors or other parties in interest in this case, (ii) does not hold any interest adverse to the Debtor's estate; and (iii) believes it is a "disinterested person" as defined within Section 101(14) of the Bankruptcy Code.

24

80.    WeinsweigAdvisors will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new material facts or relationships are discovered or arise, WeinsweigAdvisors will supplement its disclosure to the Court.

**K.    Application for Authority to Employ and Retain Cassidy Turley Commercial Real Estate Services, Inc.  as Investment Banker to the Debtor and Debtor-in-Possession**

81.    The Debtor is familiar with the professional standing and reputation of Cassidy Turley Commercial Real Estate Services, Inc. ("Cassidy Turley").  The Debtor understands that Cassidy Turley has extensive experience in providing investment banking services and enjoys an excellent reputation for services it has rendered in matters throughout the United States.

82.    Prior to the Petition Date, the Debtor engaged Cassidy Turley to provide investment advice and guidance to the Debtor, especially the sale of its assets as a going concern. As a result, Cassidy Turley has developed a great deal of institutional knowledge regarding the Debtor's operations, finances and systems.  This experience and knowledge will be valuable to the Debtor's ability to maximize value for its creditors.  Further, Cassidy Turley is well qualified and able to represent the Debtor in a cost-effective, efficient and timely manner.  Accordingly, the Debtor wishes to retain Cassidy Turley to provide assistance during this case.

83.    Cassidy Turley has informed the Debtor that it (i) has no connection with the Debtor's creditors or other parties in interest in this case, (ii) does not hold any interest adverse to the Debtor's estate; and (iii) believes it is a "disinterested person" as defined within Section 101(14) of the Bankruptcy Code.

84.    Cassidy Turley will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new material facts or relationships are discovered or arise, Cassidy Turley will supplement its disclosure to the Court.

## **CONCLUSION**

85.     Approval of the First-Day Motions filed by the Debtor is a critical step for the Debtor to maximize the recovery prospects for all interested parties, as such approval will provide for: (a) the continuation of the Debtor's existing cash management systems and other business operations without interruption, (b) the discovery of the identities and contact information of the indirect participants and beneficial Bondholders, (c) the maintenance of employee morale and confidence through the continuation of the Debtor's ordinary course wage and benefits, (d) the continuation of the Debtor's utility service and establishment of adequate protection for its utility providers; (e) the Debtor's use of cash collateral pursuant to adequate protection standards; (f) the determination that the Debtor's present resident care and service obviates the need for a patient care ombudsman; (g) the protection of personal resident information; and (h) the establishment of certain other administrative procedures to promote a smooth transition into chapter 11.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.


Date:   June 27, 2014                                /s/ Lloyd R. Kitchen, Jr.

                                                    Lloyd R. Kitchen Jr.
                                                    Executive Vice President
                                                    TEC/Gull Creek, Inc.


54758630_1

26