IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| **In re:** | **Case No. 14-_____** |
| **TEC/GULL CREEK, INC.,** | **Chapter 11** |
| Debtor. | |

**MOTION TO APPROVE AN ORDER (A) ESTABLISHING BIDDING PROCEDURES RELATED TO THE SALE OF THE DEBTOR'S ASSETS, AND (B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF FOR THE PROPOSED SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES UNDER THE DEBTOR'S CHAPTER 11 PLAN, AND (C) AUTHORIZING PAYMENT OF A BREAK-UP FEE**

TEC/Gull Creek, Inc., the debtor and debtor-in-possession in the above-captioned case (the "Debtor"), files this motion (the "Motion") for (i) entry of an order (a) establishing bidding procedures (the "Bidding Procedures") in connection with the sale of substantially all of the assets of the Debtor consisting of the Gull Creek Retirement Community (the "Facility"), (b) approving the form and manner of notice thereof for the proposed sale of the Debtor's assets free and clear of all liens, claims, encumbrances and interests of any kind, under the Debtor's chapter 11 plan pursuant to sections 1123(a)(5)(D) and 1123(b)(4) of the Bankruptcy Code, and (c) authorizing payment of a break-up fee; and in support thereof, respectfully states as follows:

I. **JURISDICTION**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

**II.     BACKGROUND**

2.      On June 27, 2014, (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  In support of this Motion, the Debtor relies on (a) the Declaration of Lloyd R. Kitchen Jr. in Support of Voluntary Petition and First Day Applications and Motion (the "Kitchen Declaration") setting forth the factual background regarding the Debtor and the events leading to the filing of this bankruptcy case filed contemporaneously herewith, and (b) the Declaration of David Kliewer, Senior Managing Director of Cassidy Turley Commercial Real Estate Services, Inc. setting forth the factual background regarding the Debtor's marketing efforts of the Facility attached hereto as Exhibit A.

3.      The Debtor is continuing in possession of its property and the management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      No trustee or examiner has been appointed in this chapter 11 case, and no committees have yet been appointed or designated.

**A.     The Chapter 11 Plan**

5.      On this date, the Debtor filed a Chapter 11 Plan (the "Plan"), and a Disclosure Statement in connection with the Chapter 11 Plan (the "Disclosure Statement").

6.      The Plan is funded primarily by the proceeds generated by selling substantially all of the Debtor's assets consisting of the Facility and provides for the distribution of sale proceeds among holders of claims, pursuant to section 1123(b)(4) of the Bankruptcy Code.

**B.     The Pre-Petition Marketing Efforts**

7.      As described in more detail in the Kitchen Declaration, on February 5, 2014, Manufacturers and Traders Trust Company, as Indenture Trustee ("Indenture Trustee") for, and on behalf of the Bondholders filed a Petition for Appointment of a Receiver in the Circuit Court for Worcester County, requesting that the court appoint a receiver for the Debtor.  Subsequently,

the Indenture Trustee and Debtor negotiated the terms of a Consent Order, which, among other things, provided that (a) the Debtor engage an investment banker acceptable to the Indenture Trustee to diligently market the Facility for sale; (b) the Debtor selecting a stalking horse bidder and negotiating and executing an asset purchase agreement for the sale of the Facility; and (c) the Debtor filing a chapter 11 bankruptcy for the purpose of consummating the asset purchase agreement.

8. In March, 2014, the Debtor, with the consent of the Indenture Trustee, engaged Cassidy Turley Commercial Real Estate Services, Inc. ("Cassidy Turley"), as its investment banker to market the Facility.

9. Cassidy Turley promptly commenced a robust and thorough marketing process by identifying and contacting 183 potential buyers comprised of regional, national and institutional buyers which were identified by Cassidy Turley as having a potential interest in a Facility of this type. As a result, Cassidy Turley secured confidentiality agreements with and distributed the Offering Memorandum to 54 buyers. Once these prospective buyers received the Offering Memorandum, Cassidy Turley conducted follow-up marketing efforts including making regular contact with these prospective buyers, offering to answer questions and provide additional information. In addition, all 54 prospective buyers were provided access to the electronic data room to access supplemental information and to assist with the prospective buyers' due diligence. Of these 54 prospective buyers, 26 of them accessed the data room to view the additional documents and information. Cassidy Turley requested that non-binding letters of intent to purchase the Facility be submitted by May 7, 2014, and a result of their marketing efforts, received thirteen (13) letters of intent from prospective buyers.

10. The Debtor, in consultation with Cassidy Turley, the Debtor's other advisors, and the Indenture Trustee, invited eight (8) of these prospective buyers to tour the Debtor's Facility and submit bids. All eight (8) of these potential bidders toured the Facility from May 14 through May 22, 2014 with Cassidy Turley and the Facility's Executive Director. Cassidy Turley followed up regularly with each potential bidder and all groups were given equal access to due diligence information, were promptly notified as new documents were posted to the electronic data room, and each potential bidder was invited to submit a "final and best" offer.

C. **The Stalking Horse Agreement**

11. As a result of these marketing efforts, the Debtor, after consultation with Cassidy Turley, the Debtor's other advisors, and the Indenture Trustee, agreed to the terms of an asset purchase agreement (together with the schedules and related documents thereto, the "Stalking Horse Agreement"), a copy of which is attached hereto as Exhibit 3 to the Bidding Procedures Order (hereinafter defined) between the Debtor and Greenwich Investors Gull Creek Owner, LLC (the "Stalking Horse Purchaser") pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets (as defined in the Stalking Horse Agreement) on the terms and conditions specified therein. The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein, however, owing to the extensive marketing efforts that have already been conducted, the bidding timeline is appropriately tailored.

12. Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Purchased Assets for (A) $8,033,333.00 plus or minus certain prorations and credits; and (B) the assumption of certain liabilities. The Stalking Horse Agreement also provides, among other things, that the Purchased Assets will be sold free and clear of all Liens (as defined in the Stalking Horse Agreement) and that the Court approve

payment to the Stalking Horse Purchaser of a break-up fee in an amount equal to $200,000.00 (the "Break-Up Fee"), which shall constitute an administrative expense of the Debtor under Section 503(b)(1) of the Bankruptcy Code, and which shall be payable in cash within two business days following the closing of any Alternative Transaction (as defined in the Stalking Horse Agreement) and before payment is made to any of the Debtor's Lenders (as defined in the Stalking Horse Agreement).

13. The Debtor's Facility has been thoroughly marketed to a large number of potentially interested parties, and thus is in optimum position to be sold under the Plan to the highest and best bidders. However, to ensure the Debtor receives the highest and best offer for the sale of substantially all of their assets, the Debtor, together with its investment banker Cassidy Turley, pursuant to the Bidding Procedures will continue the marketing process and contact (i) all potential purchasers previously identified or solicited by the Debtor; (ii) any additional parties who have expressed an interest in acquiring the Debtor's Facility; and (iii) all other potentially interested parties identified by the Debtor and its advisors.

14. The Debtor and its advisors have determined that the proposed sale is in the best interest of creditors to maximize creditors' recovery, and that to seek approval of the sale transaction through the Plan provides creditors with the best opportunity to participate in this case. The Indenture Trustee consented to Debtor entering into the Stalking Horse Agreement, and the Indenture Trustee consents to the Bidding Procedures as set forth herein. Thus, the Debtor seeks this Court's approval of Bidding Procedures along with the Disclosure Statement, so that the Plan can be solicited for approval from creditors at the same time the Debtor's assets are solicited for competing offers under the Bidding Procedures.

## III. RELIEF REQUESTED

15. By this Motion, the Debtor requests (i) entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Bidding Procedures Order</u>") (a) approving the Bidding Procedures (as described below and attached to the Bidding Procedures Order as <u>Exhibit 1</u>), including establishing all relevant dates for the sale process, and (b) approving the form and manner of the Sale and Auction Notice (as defined below and attached to the Bidding Procedures Order as <u>Exhibit 2</u>), and (ii) ultimately the entry of an order authorizing and approving the sale of the Purchased Assets through the Plan, free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests; and (iii) such other related relief that is necessary and proper.

### A. The Bidding Procedures and Auction

16. The proposed Bidding Procedures are designed to maximize value for the Debtor's estate, while ensuring an orderly sale process consistent with the timeline available to the Debtor under the Plan. The Bidding Procedures describe, among other things, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any auction (the "<u>Auction</u>"), and the selection and approval of any ultimately Successful Bidder.[1]

17. A summary of the key terms of the Bidding Procedures follows:[2]

   a. <u>Confidentiality</u>. In order to receive any confidential information from the Debtor, to submit a Qualified Bid and become a Qualified Bidder, and to participate in the Auction, a Potential Bidder must submit to the Debtor (i) a confidentiality agreement on terms substantially similar to those provided to the Stalking Horse Purchaser and (ii) written evidence of available cash, a commitment for financing, or other evidence of the

---

[1] Capitalized terms utilized but not defined shall have the meaning ascribed to them in the Bidding Procedures.

[2] The following is a summary of the key terms of the Bidding Procedures. To the extent the Bidding Procedures attached to the Bidding Procedures Order as <u>Exhibit 1</u> and this summary disagree, the terms of the Bidding Procedures attached to the Bidding Procedures Order shall control.

6

        Potential Bidder's financial ability to consummate the sale transaction of the Purchased Assets.

b. <u>Due Diligence</u>. The Debtor will assist interested parties in conducting their respective due diligence (if any) until 5:00 p.m. on August 26, 2014.

c. <u>Qualified Bidders</u>. Any Potential Bidder seeking to become a Qualified Bidder and submit a Qualified Bid must deliver written copies of its offer in compliance with these Bidding Procedures to: Cassidy Turley, Attn: David Kliewer, 4301 Anchor Plaza Parkway, Suite 400, Tampa, Florida 33634 or via e-mail at David.Kliewer@cassidyturley.com, so as to be received no later than **August 28, 2014 at 5:00 p.m. prevailing Eastern Time** (the "<u>Bid Deadline</u>"), and meet the following conditions:

    (1) Provides for a cash purchase price for the Purchased Assets in an amount equal to or greater than the Purchase Price, plus $250,000.00 (the "<u>Minimum Bid</u>");

    (2) Includes a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable offer on the terms proposed;

    (3) Includes an executed "clean" version of the Stalking Horse Agreement signed by an authorized representative of the Potential Bidder, together with a blackline showing Potential Bidder's modifications, if any, to the Stalking Horse Agreement;

    (4) Is not subject to any due diligence, financing or other contingencies, including but not limited to contingencies relating to (x) the completion of unperformed due diligence, or (y) the approval of the Potential Bidder's board of directors or other internal approvals or consents;

    (5) Contains terms and conditions no less favorable to the Debtor's estate in the aggregate than the terms and conditions in the Stalking Horse Agreement;

    (6) Does not provide for the payment to the Potential Bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement;

    (7) Is not subject to any conditions to closing other than those set forth in the Stalking Horse Agreement;

    (8) Provides for a closing on the date required by the Stalking Horse Agreement; and

7

    (9) Is accompanied by a deposit in immediately available funds equal to at least 10% of the Minimum Bid (the "<u>Deposit</u>").

d. <u>Selection of Qualified Bidders</u>.  A Potential Bidder that submits the documents, information and Deposit required above, and that the Debtor, in its reasonable and sole discretion, after consultation with its advisors and the Indenture Trustee, believes is on the same or better terms than the bid submitted by the Stalking Horse Purchaser and is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "<u>Qualified Bidder</u>" and such bid will be deemed a "<u>Qualified Bid</u>."  The Deposits shall be held by the Debtor in a segregated debtor-in-possession bank account.

As promptly as practicable after a Potential Bidder submits all of the documents, information and Deposit required above, the Debtor will determine and notify the Potential Bidder and the Stalking Horse Purchaser if such Potential Bidder is a Qualified Bidder.  Notwithstanding the foregoing, the Stalking Horse Purchaser will be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Procedures and the Auction.

e. <u>No Qualified Bids</u>. If the Debtor does not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtor will not hold an Auction and the Stalking Horse Purchaser will be named the Successful Bidder on the Bid Deadline.

f. <u>Auction</u>.  Scheduled for, and Successful Bidder to be selected on **September 3, 2014 at 1:00 p.m. Eastern Time** at the law offices of McGuireWoods LLP, 7 Saint Paul St., Suite 1000, Baltimore, MD 21202.  The Auction shall be conducted in accordance with the procedures set forth in the Bidding Procedures.

g. <u>Back-up Bidder</u>.  A condition of the participation in the Auction will be that the Qualified Bidder submitting the second highest Successful Bid shall be declared the Back-up Bidder, and must agree to acquire the Purchased Assets at the Back-up Bidder's highest Auction bid price if the Successful Bidder fails to close.

h. <u>Plan Confirmation</u>.  Approval of the sale to the Successful Bidder to be considered by the Court at the Plan Confirmation Hearing.  At the Plan Confirmation Hearing, the Debtor will seek, among other things, authority to consummate the sale pursuant to sections 1123(a)(5)(D) and 1123(b)(4) of the Bankruptcy Code.

      i.      <u>Failure to Consummate Successful Bid</u>.  If for any reason the Successful Bidder fails to timely consummate the transaction contemplated by the Successful Bid and the Confirmation Order, the Debtor may declare the Back-Up Bidder as having submitted the highest or otherwise best bid and seek to consummate the Back-Up Bid.

      j.      <u>Treatment of Deposits</u>.  Deposits shall be returned or forfeited in accordance with the terms of the Bidding Procedures.

19.    The Bidding Procedures are reasonable and designed to promote competitive bidding and to maximize the value of the Debtor's estate.  Accordingly, the Debtor believes that it is in the best interest of the Debtor's estate for the Bidding Procedures to be approved.

**B.**    <u>**Notice of Proposed Bidding Procedures and Auction**</u>

20.    In order to provide interested parties notice of the Auction and related Bidding Procedures, within three (3) business days following the entry of an Order approving this Motion, the Debtor will serve a notice of the Auction and Bidding Procedures (the "<u>Sale and Auction Notice</u>"), a form of which is attached hereto as <u>Exhibit 2</u>, along with the Bidding Procedures which will be an attachment to the Sale and Auction Notice, by first class mail, postage prepaid, to:  (a) all potential purchasers previously identified or solicited by the Debtor and any additional parties who have expressed an interest in acquiring the Debtor's Facility, (b) all other potentially interested parties identified by the Debtor or its advisors, (c) the Office of the United States Trustee, (d) counsel for the Indenture Trustee, (e) the Stalking Horse Purchaser, (f) all parties receiving a copy of the Disclosure Statement and ballot package, (g) the Maryland Department of Health and Mental Hygiene, (h) the United States Attorney's Office for the District of Maryland, (i) state and applicable local taxing authorities in Maryland, (j) the Internal Revenue Service, (k) the state attorney general in Maryland, and (l) all other parties who have requested notice in this case as of the date of the entry of the Order approving this Motion.

21. The Sale and Auction Notice satisfies the notice requirements of Bankruptcy Rules 2002 and 6004, and constitutes good and sufficient notice of the proposed sale; accordingly, the Debtor requests that the form and manner of service of the Sale and Auction Notice be approved in all respects.

**C.      Sale Approval at the Plan Confirmation Hearing**

22. At the hearing for confirmation of the Plan (the "Plan Confirmation Hearing"), the Debtor will seek entry of an order (the "Confirmation Order"), among other things, (i) confirming the Plan, (ii) authorizing and approving the sale to the Successful Bidder, and (iii) exempting the sale and conveyance of the Purchased Assets from any transfer tax, stamp tax or similar tax pursuant to section 1146 of the Bankruptcy Code. The Confirmation Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court.

**IV.    APPLICABLE AUTHORITY**

**A.     The Bidding Procedures and Auction are Appropriate and Should be Approved**

23. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),* 107 F.3d 558, 564-65 (8th Cir. 1977) (in bankruptcy, "a primary objection of the Code [is] to enhance the value of the estate at hand").

24. The Debtor submits that the proposed Bidding Procedures and Auction enables the Debtor to realize the maximum value from the sale of the Debtor's assets. The Auction will provide the opportunity to generate competitive bidding, thereby yielding the highest and best offers for the Facility. Finally, the Bidding Procedures include appropriate noticing procedures to ensure all parties in interest will receive adequate notice of all relevant information and an opportunity to participate in the bidding process.

**B.     The Sale of the Assets Should be Approved Under the Chapter 11 Plan**

25.     Section 1123(a)(5)(D) of the Bankruptcy Code provides that a chapter 11 plan shall provide adequate means for its implementation, such as a sale of all or any part of the property of the estate, either subject to or free of any lien. Section 1123(b)(4) of the Bankruptcy Code provides that, subject to section 1123(a) of the Bankruptcy Code, a chapter 11 plan may provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims. The Debtor has filed a Plan which provides for a sale of its assets free and clear of liens and other interests, with the proceeds of sale distributed to creditors. The Debtor with its advisors has determined that the best means for the Plan's implementation is an orderly liquidation, and the means to generate the best and highest sale consideration of the Debtor's assets is the Bidding Procedures, and that seeking approval of the sale transaction through the Plan provides creditors with the best opportunity to participate in this case. The Indenture Trustee consented to Debtor entering into the Stalking Horse Agreement and the Indenture Trustee consents to the Bidding Procedures as set forth herein

**C.     The Break-Up Fee is Reasonable**

26.     The Debtor believes that the Break-Up Fee is necessary to preserve and maximize the value of the Purchased Assets, is reasonable and appropriate under the circumstances, and should be approved.

27.     The Stalking Horse Purchaser was unwilling to enter into the Stalking Horse Agreement without the inducement of the Break-Up Fee on these terms. Without the Stalking Horse Purchaser, the Debtor would not be able to obtain a sale price of at least the purchase price of $8,033,333.00. The Break-Up Fee of $200,000.00 compared to the cash portion of purchase price under the Stalking Horse Agreement of $8,033,333.00 equals 2.49% of the

purchase price. The Debtor submits that this is a fair and reasonable percentage in relation to the purchase price, and the costs and efforts expended by the Stalking Horse Purchaser to consummate this transaction. *See In re Hupp Indus. Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). Moreover, the Break-Up Fee is the result of good faith, arm's length negotiation between the Debtor and the Stalking Horse Purchaser. *See In re Integrated Resources, Inc.,* 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed by 3 F.3d 49 (2d Cir. 1993); *In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

28. The Debtor believes that the Break-Up Fee is fair, reasonable and a necessary cost of the administration of the Debtor's estate, reflects the exercise of prudent business judgment consistent with its duties to creditors and other parties in interest, and represents the best method for maximizing the value to the estate of the Purchased Assets. *See In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (primary objective in bankruptcy sale is to enhance value of estate).

**D.** **The Successful Bidder Must Cure Defaults Related to the Assumption and Assignment of any Transferred Contracts**

29. A trustee or debtor-in-possession may assume and assign executory contracts and unexpired leases in accordance with section 365 of the Bankruptcy Code. Section 365(b) of the Bankruptcy Code requires that the trustee cure, or provide adequate assurance that the trustee promptly will cure, any defaults that existed under each executory contract or unexpired lease sought to be assumed, other than those defaults relating to insolvency, bankruptcy, other financial conditions of the debtor or penalty rates imposed by the debtor's failing to perform nonmonetary obligations under the executory contract or lease. With respect to those executory contracts and unexpired leases that the Successful Bidder and the Debtor decides should be assumed by the Debtor and assigned to the Successful Bidder

pursuant to the proposed sale, the Debtor anticipates that there will be no cure amounts due. Nonetheless, if there are any defaults under such contracts or leases, the Debtor will cause the Successful Bidder to cure them in accordance with section 365(b) of the Bankruptcy Code. The Debtor also will provide the counterparties to such contracts and leases with adequate assurance of future performance by the Successful Bidder under those contracts and leases in accordance with section 365(f) of the Bankruptcy Code.

30. The Debtor intends to file and serve a cure schedule (the "Cure Schedule") after the Auction and at least three (3) days prior to the Plan Confirmation Hearing. The Cure Schedule shall consist of a list of the contracts and leases that will be assumed and assigned to the Successful Bidder (the "Transferred Contracts"), and a schedule of the amount, if any, which the Debtor believes must be paid to cure any existing defaults, as determined in accordance with section 365(b) of the Bankruptcy Code (the "Cure Amount"), with respect to the Transferred Contracts.

31. The Debtor requests that the Court schedule a hearing concurrently with the Plan Confirmation Hearing to consider any objections to a Cure Amount set forth on the Cure Schedule. If the counterparty to a Transferred Contract does not object to the proposed Cure Amount, that party will not need to take further action, and the Cure Amount will be paid upon consummation of the sale by the Successful Bidder. If the counterparty disagrees with the Cure Amount, that party should be required to file an objection to the Cure Amount and timely file and serve the objection upon the Debtor. Any such objection to the Cure Amount should be in writing and set forth in reasonable detail (a) the nature of and grounds for the objection, and (b) the amount which the objector believes is the appropriate Cure Amount, and should be accompanied by a reasonably detailed statement supporting the objector's

allegation of the appropriate Cure Amount. Any failure to file and serve an objection to the Cure Amount should constitute a waiver of any rights the counter-party may have to dispute the Debtor's assertion of the Cure Amount due to that party as set forth on the Cure Schedule.

### E. The Sale and Auction Notice is Appropriate and Should be Approved

32. Pursuant to Bankruptcy Rule 2002(a)(2), this Court shall direct the method of giving notice for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. *See* Bankruptcy Rule 2002(c)(l). The notice of the proposed use, sale, or lease of property is sufficient if it generally describes the property. *Id*. The Debtor purposes to send the Sale and Auction Notice, along with Bidding Procedures as an attachment to the Sale and Auction Notice, to all potentially interested purchasers, and to all creditors at the same time they receive the Disclosure Statement in their ballot package. The Debtor therefore requests that the form and manner of service of Sale and Auction Notice which meets the various requirements of the Bankruptcy Rules be approved in all respects.

### V. NOTICE

33. No trustee, examiner, or creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been given to the following parties or to their counsel, if known: (i) the Debtor's 20 largest unsecured creditors, (ii) the Indenture Trustee, (iii) The Depository Trust Company; (iv) the Maryland Economic Development Corporation (v) the Office of the United States Trustee and (vi) any other party that requested notice in this case prior to the transmission of this Motion. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## VI.  STATEMENT PURSUANT TO LOCAL RULE 9013-2

34. Pursuant to Rule 9013-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, the Debtor states that, in lieu of submitting a memorandum in support of this Motion, it will rely solely upon the grounds and authorities set forth herein.

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  June 27, 2014                    McGUIREWOODS LLP

 /s/ James E. Van Horn
James E. Van Horn (Bar No. 29210)
7 Saint Paul Street, Suite 1000
Baltimore, Maryland 21202
(410) 659-4468
jvanhorn@mcguirewoods.com

*Proposed Counsel for the Debtor,
TEC/Gull Creek, Inc.*